## OTT vs. SOULARD.

1. A claim was presented to the recorder of land titles for confirmation, and it was supposed to conflict with the St. Louis commons. The claimant abandoned so much of his claim as conflicted with the commons, and had a confirmation for 30 arpents, that being considered as the amount of the excess not conflicting with the commons. The act of confirmation stated "that only so much was abandoned as lies west of the line of the commons." Held, that the confirmation was not limited in quantity to 30 arpents, but embraced all the claim not included in the commons; the quantity is mere description, which must yield to other matters of description.

2. If no plat, or a defective plat of the survey of a grant, be filed with the recorder, the plat recorded in the books in the surveyor general's office may be resorted to as evidence.

3. The plat in the surveyor general's office is not better evidence than that filed with the recorder—it is only auxiliary evidence.

4. When a survey is made by the officers of the United States, and there is a contest between the United States and the grantee, the State courts will not interfere. But when the rights of others are involved, those rights will not be permitted to be divested by the United States, or its officers.

5. When the calls of a survey are all ascertained and no resort to external evidence is necessary, it is a question for the court. But when parol evidence has to be resorted to, to identify the calls, the facts must be found by a jury.

6. The petition for a concession, called for "le chemin public," the public road; the certificate of survey accompanying the plat of the land conceded, called for "el real comino," the royal road. There being two roads near each other, and the right of the parties depending upon the determination of the road intended in the grant, it is a question of law and fact: the facts to be found by the jury.

7. The courts of this State are bound to take judicial notice of the Spanish laws in force in this territory.

## ERROR to St. Louis Court of Common Pleas.

GEYER, for Plaintiff in error.

The plaintiff in error relies for a reversal of the judgment of the common pleas, on the following grounds:

1. The confirmation by the recorder of land titles, confirmed by the act of April, 1816, vested in James Mackay, a tract of thirty arpents, bounded west by the east line of the St. Louis commons.

2. The survey made by L. M. Eiler, deputy surveyor, approved by the surveyor general, is conclusive between the United States and Mackay, of the boundaries of the tract reported for confirmation by the recorder.

3. The land east of Eiler's survey, being surveyed and sold under the authority of the United States as public land, prior to the passage of the act of 14th July, 1836, the representatives of Mackay acquired no title by that act.

4. The surveyor general had no lawful authority to annul the survey previously made under the authority of and approved by his predecessor, nor to extend such survey, or make a new one, so as to include lands which had been previously sold under the authority of the United States.

5. If prior to the 4th July, 1836, the lot in question was without the boundaries of the tract confirmed to Mackay by the recorder, and within fractional section 26, T. 45, R. 7 E, as surveyed under the authority of the United States, that the United States, before that day, sold said land to R. Duncan, the plaintiffs could not recover, unless the lot in dispute was within the boundaries of the tract of land granted to Mackay, as designated on the plat and certificate filed by Mackay, with his claim, and the court erred in refusing so to direct the jury.

6. The call in the grant and survey for Mackay, for the king's highway, should be understood to be a road previously established by authority, and if previous to that grant there was such a road laid out, and established between the lands of Soulard and Cerre, then the southern boundary of the grant to Mackay, could not be extended east of that road, the calls governing and controlling course and distance.

7. In determining the boundaries of the grant, and the extent of the confirmation under it, the survey and certificate filed by the claimant is better evidence than the diagram of the same survey, furnished by the surveyor general, as copied from the *Register de Arpentage.*

8. The diagram certified by the surveyor general, as copied from *Register de Arpentage,* ought not to have been received in evidence ; it does not appear to have been an official act, is certified by no one nor does it appear when, or how it came to the office of the surveyor general.

9. The figurative plat of Chouteau's mill tract ought not to have been admitted as evidence, because it contains manifest and material alterations, and purports to contain surveys not mentioned in the certificate of the surveyor.

10. The testimony taken by, and the proceedings of the commissioners in relation to the location of Carondelet road, ought to have been admitted in evidence.

11. The sheriff's deed to Soulard is not competent evidence; because the description in the advertisement is insufficient: the levy is upon a

Ott vs. Soulard.

tract of 282 arpents, except such as had been theretofore sold, without designating the parts excepted: the sale was made in parcels according to a division indicated on a plat furnished by Soulard, the plaintiff.

12. Upon the whole case the merits are with the defendant, now plaintiff in error, and the court of common pleas ought to have sustained the motion for a new trial.

Acts of Congress, 2d March, 1805, public lands vol. 1, ch. 74, p. 122; do 28th Feb., 1806, do. do., ch. 79, p. 132; do. 21st April, 1806, do. do., ch. 84, p. 138; do. 3rd March, 1807, do. do., ch. 92, p. 156; do. 13th June, 1812, do. do., ch. 140, p. 217; do 2d Aug., 1813, do. do., ch. 156, p. 233; do. April, 12th, 1814, do. do., ch. 162, p. 242; do. 29th April, 1816, do. do., ch. 197, p. 280 ; do. 9th July, 1832, do. do., ch. 439, p. 505 ; do. 2d March, 1833, do. do., ch. 454, p. 518 ; do. 4th July, 1836, do. do., ch. 507, p. 557; do. 3rd March, 1819, do. do., ch. 232, p. 312.

SPALDING AND TIFFANY, for Defendant in error.

POINTS AND AUTHORITIES.

I. The sheriff's deed to the plaintiff below was properly admitted in evidence.

1. The sale was not irregular on account of its having been made on the 31st of March, on an execution returnable to 1st Monday of February, 1825.   Rev. Code of 1825, pages 280–1, sections 5 and 6. This act makes the execution returnable to third Monday of March, 1825.

2. Nor is the sale void for want of a sufficient advertisement.   2 Cain. 61.   Simonds vs. Catlin, at page 66, the court lay down the rule to be, *"that at sheriff's sales no property can pass but what is at the time ascertained and declared."*   13 John. Rep. 96, Jackson vs. Roosevelt, at page 103, the court say that the least that can be required of the sheriff, is *so to locate the lands as to afford means to the by-standers, and bidders, of informing themselves of the value.*   13 John. Rep. 537, p. 552, the court says "the sheriff cannot sell any land on execution, but such as the creditor can enable him to describe with reasonable certainty."   8 Mo. Rep. 186, Evans vs. Ashley.   The court ask why the sheriff, if he had failed to get information as to Price's interest, did not state the circumstances, and make the sale in such a way as that nobody could have been deceived.

All the above cases contemplate a reasonable certainty of description *given at the time of sale.*

Geyer's Digest, 266, sec. 66, was the only act in force directing as to the sale by sheriff, and as to advertisement.

7 Mo. Rep. 531, Hunt vs. Rector, "a sheriff's deed describing the land sold as three and one half eighths of the Boonville tract, situated in Cooper county, on the south side of the Missouri river, is not void for uncertainty of description."

12 Mass. Rep. 514, at page 521-2, the statute required an advertisement, and the court say, "at the sale it was in the power of the debtor to appear and represent the situation of the estate and title; and that the sheriff was then bound to make known to the public what he knew on the subject." This was on foreclosure of mortgage.

14 Mass. Rep. 404, at page 407, the levy was of one-seventh, (1-7,) when the debtors was of one-eighth, (1-8,) the court say it was good, that if execution be levied on one hundred acres and debtor had only fifty, the levy would be good for the fifty.

II. The confirmation by the recorder of land titles embraced all of the Mackay concession, lying east of the line of the commons. This position is contained in the first instruction given for the plaintiff:

1. This confirmation is evidenced by the entry of the recorder compared with the documents.

2. That entry states that Mackay claims about 30 arpents, and that Leduc, his agent, abandons all but 30 arpents, supposed to be comprehended in the commons.

3. Then follows the act of the recorder, a kind of short hand memorandum, "confirmed 30 arpents; no more abandoned than may fall within the commons, should they be confirmed."

4. The spirit and intendment of this act, was the confirmation of all east of the eastern line of the commons; and it is not confined to the quantity named, of 30 arpents. The application, as well as the recorder's memorandum, shows this.

III. Said confirmation embraced all the land east of the line of the commons, according to the Spanish survey as certified from the "Registre de arpentage," or record of surveys transferred by the Spanish government, which survey and plat are to be considered better evidence of the Spanish survey of the Mackay tract, than the copy from the recorder's office.

IV. The survey by De Ward being sanctioned by the department, after there had been conflicting claims, and made carefully for the purpose of correcting errors, by instructions from the surveyor's office, was legally to be regarded by the jury, as the authoritative and correct survey determining the boundaries of the Mackay claim.

V. The confirmation of the Mackay claim by the act of 4th July, 1836, was a better title than that under the pre-emption of Duncan.

Acts of Congress of 2d March, 1811, Geyer's digest; do. 9th July, 1832, do.; do. 4th July, 1836, do; 2 Howard's Rep. 285, Stoddard, et. al. vs. Chambers, showing that lands, the claims to which had been duly filed with the recorder, were reserved from sale by the act of Congress of 9th July, 1832.

VI. All the instructions of the defendant below, making a road established by authority, a boundary of the Mackay claim, were rightly refused.

1. Because there was no such road there.

2. There was a road actually in use there, and the jury had a right to consider that, as the road referred to in the certificate of survey.

3. The claim, as filed, was according to survey, and had that even crossed the road, the confirmation would have been of the same extent.

VII. The survey of the Chouteau mill tract was rightly admitted in evidence.

SCOTT, J., delivered the opinion of the court.

This was an action of ejectment brought by Soulard against Ott, in the St. Louis circuit court, and thence transferred to the St. Louis court of common pleas, where there was a verdict and judgment for the plaintiff, to reverse which this writ of error is prosecuted.

The facts, as preserved by the bill of exceptions, will be best understood stated in their chronological order, and are as follows:

On the 10th October, 1782, Gabrielle Cerre presented a petition to the lieutenant general, Don Francisco Cruzat, praying a grant of 8 arpents of land, having its principal front on the public road. (*camino publico*,) going from St. Louis to the village of the Prairie Catalan, (*Carondelet*,) and running thence to the river—and on the 12th Oct. 1782, the lieutenant governor grants the land prayed for.

On the 18th November, 1786, Joseph Brazeau petitioned for a grant of ten arpents of land, from north to south, bounded east by the Mississippi, and west by the main road of the little prairie. On the 20th of the same month, the Lieut. Governor grants to the petitioner, 10 arpents from north to south, bounded on one side by the river Mississippi, and on the other by the Main road, that leads to the *Prairie a Catalan*.

On the same 18th November, 1786, Gabriel Cerre applied for an extension of his grant of the 12th October, 1782, by granting six ar-

37

pents between his former grant, and that of M. Brazeau, and extending from the royal highway, (*Chemin Royal*) to the Mississippi—and on the 20th of the same month, the Lieut. Governor granted the land solicited.

On the 28th March, 1787, J. M. Papin applied for a grant of 8 arpents of land, bounded west by the main road ( *Camino Real*) leading to M. Delor's village, (*Carondelet*,) which was granted on the 30th of the same month.

On the 7th of August 1798, Antoine Soulard petitioned for a grant of a tract of 14 arpents in front, by 15 in depth, opposite to a piece of land asked in augmentation by Don. Gabl. Cerre, and granted to him; the same tract of land to be bounded north by lands adjoining St. Louis, south of Mill creek, south and west by vacant lands of the royal domain, and east by a *public road* eighty feet in width, that leads from St. Louis to the village of Carondelet, and that divides the said land of Gabriel Cerre, from that solicited. On the same day the land was granted, and the petitioner was ordered to survey and make a certificate.

The petition of James Mackay, under whom the plaintiff claims, is dated 9th October, 1799. He applies for a grant of a piece of vacant land to the south of this town, (St. Louis) of about 200 and some arpents superficies, which piece of land is (*shall be*) bounded as follows : To the north of the land of Mr. Auguste Chouteau; on the south by that of Mr. Antoine Soulard; on the east by the public road (*chemin pub'ique*) which leads from Carondelet to this town; and on the west by the domain of his majesty. The grant and order of survey are dated on the same day, and directs the surveyor Don A. Soulard, to put the petitioner in possession of the land he solicited, at the place designated in the memorial; and this being executed, he, the surveyor, shall draw a plat of the survey, delivering the same to the party, with his certificate, in order that it shall serve him to obtain the concession and title in form, &c.

On the 19th November, in the same year, Joseph Brazeau, applied for an extension of his grant westward. The petition states the previous concession in 1786; of 10 arpents comprised between the river and the main road, (*Chemin Royal*,) and prays an augmentation of 12 arpents in front, by such depth as will complete to him 30 arpens, &c. On the same day, the Lieut. Governor granted the land prayed for.

On the 5th of January, 1800, the grants to Gabriel Cerre of the 12th October, 1782, and 20th Nov. 1786, are certified to have been survey-

ed by A. Soulard, as one tract, on the 10th Nov. 1799. The certificate refers to the figurative plat prefixed. On that plat, the western boundary of the tract is represented as N. 28 3-4 E, 142 perches, and the words "*camino del villano Carondelet*," are written along that line, representing the western boundary to be the road.

The survey of the grant to Soulard, of 7th Aug. 1798, represents the survey to have been made 20th January, 1800. The certificate refers to the figurative plat prefixed. That plat represents the letter A. at the north-east corner of the survey, B. at the north-west, C. at the south-west, and D. at the south-east, and a stone at each of said corners. The east line is represented as S. 28 1-4 W. 142 perches; the south line as N. 78 W. 150 perches; the west boundary as N. 28 1-4 E. 142 perches; and the north line as S. 78 E. 150 perches.

On the same plat the line of the commons is represented as running S. 24 W. crossing the north line of said Soulard's survey, forty-three perches from the north-east corner. On the same plat is represented the boundaries of the grants to Cerre; and between the survey for Cerre and that of Soulard, is a space running the whole length of the east front of Soulard's tract, on which space are written the words "*Camino de St. Louis a Carondelet de 80 pds de hancho*," and east of that space, and within the grant to Cerre, lines are drawn irregularly crossing the north line of Cerre's tract and thence to the south-west corner of the same tract; along these lines is written *viego camino*, or *old road*. The certificate states the n. e. corner of the survey of Soulard's grant, to be 93 perches to north 7 1-2 east of the south tower; the boundaries of the tract are stated to be, north by a piece of vacant land next to Mill creek; south, in part by vacant lands, a cross road, and land of Brazeau; on the east, by the road going from St. Louis to Carondelet.

The certificate of Soulard, given in evidence by the plaintiff, is dated 17th Dec. 1802, states that on the 24th of the same month, he surveyed the land granted to Mackay, as by a figurative plat which precedes the certificate. The land bounded on the north by land of A. Chouteau; south in part by land of A. Soulard, and royal domain; east in part by land of Auguste Chouteau, and in part by the royal highway (*Rl. Camino*) from this town to the village of Carondelet; and west by the royal domain.

In June 1802, partition was made of the estate of the wife of Gl. Cerre, who had then departed this life, and in that partition the land granted to Gl. Cerre, and surveyed for him in January, 1800, was allotted to the wife of Antoine Soulard. Previous to the death of Ma-

dame Cerre, Gabriel Cerre occupied the land granted to him ; he had enclosed the eastern part, his western fence being paralled to his western boundary, and distant therefrom about 300 feet.  At that time the space between his grant, and that of Soulard, was not used as a road, being grown up with trees and undergrowth.  The road traveled, led from the bridge to the north-west corner of Cerre's enclosure, (his north fence being on or near his north line,) and from that point southward, there were several roads traveled, between Cerre's west fence and his western boundary, but that most usually traveled was very near the fence, until at or near his south boundary, where it diverged to the west, into the King's highway.  After the allotment of Cerre's land to Soulard, in June 1802, Soulard took possession, and immediately extended his fence to, or very near to the western boundary of the grant to Cerre, and the space between the grant to Cerre and that to Soulard, which is admitted to be the space now occupied by Carondelet Avenue, has ever since been used as a part of the road from St. Louis to Carondelet.

The certificate of Soulard given in evidence by the plaintiff, bears date 17th Dec. 1802, and states that on the 24th of the same month, he surveyed the land granted to James Mackay, as represented by a figurative plat prefixed.  The boundaries are stated to be: on the north, by land of A. Chouteau; south, in part by land of A. Soulard, and in part by public land; east, in part by land of A. Chouteau, and in part by the royal highway ( *Rl. Camino,* ) from this town to Carondelet ; and west, by public land.  The plat prefixed, gives the courses and distances of all the lines except one, that is the north-east.  The south boundary is n. 78 e. 365 poles.  On the plat and eastward of the survey, there is a road traced from the point of intersection of the n. e. and s. e. boundaries, in a southerly direction, passing some distance east of the eastern termination of the south boundary.  Near the eastern end of the southern boundary, as represented on the plat, is written "Don Anto. Soulard."  This plat and certificate were certified by the recorder of land titles, as part of the records in his office.

A plat certified by the surveyer general, though objected to, was given in evidence.  It is a diagram without signature or date ; but is certified by Silas Reed, surveyor, &c. that the plat, and the notes thereto are correctly copied from page 55 of the *Registre d' Arpentage,* *St. Louis,* A, in this office.  At the top, above the diagram some distance, are the words "Don Santiago Mackay, No. 94 ;" and beneath the words—"*Nota—Situe au S. de la petite Rivere du Moulin qui est aupres de cette ville.  Les banes indique sur le plan, tous les arbres*

*sont plaques—Arpentee le* 24, 8 *bre* 1802, *en vertu du decret de M. Le Lr. Govr. Don Charle Dehault Delassus, en date de* 9, 8 *bre,* 1799— *Certificate d' Arpentage expedie du* 17, *X bre,* 1802."

The diagram differs from the plat as certified by Soulard, and given in evidence by the plaintiff, in that, it represents the Mill creek as touching the extreme east corner; and along the north-east line are written the letters and figures "S 29 E, 5 a 6 p." and from a point in the south line, there is drawn a line southward, and between that and the eastern terminus of the south line, the distance is represented to be 16 a 9 prs.

In 1806, Soulard claiming under Cerre, by the grants of 1782 and 1676, and in his own right, under the grant in 1798, and James Mackay under the grant to him of 9th October, 1799, presented their respective claims before the board of commissioners, filing their grants and surveys as required by law. The claim of Soulard under Cerre, was confirmed by the board 30th Aug. 1806. On the claim of Soulard in his own right, that of Mackay, and many others calling for the Carondelet road, the board proceeded to take testimony on the spot for the purpose of determining the locality of said road. The testimony taken, and the proceedings of the commissioners thereon, were objected to, and excluded from the jury.

It appears by the record of the board of commissioners, given in evidence by the plaintiff, that on 22d July, 1806, Mackay's claim was examined by the board, and thereupon, Auguste Choteau testified, that the land was surveyed in 1804 or 1805, and he never heard of a concession before the survey. The board decided the concession to be antedated. On the 31st July, 1807, the consideration of the claim was resumed, but not finally decided on until the 4th of Nov. 1800, when it was rejected.

No proceeding of the board on Soulard's claim is in evidence, until Dec. 16, 1813, when it appears he claimed 56 arps. 9 perches, under the concession of 9th Aug. 1798, for 304 arps. 48 perches; the difference between the claim and concession abandoned, as lying within the claim of the people for commons. James Mackay swears to the concession.

And on the 28th December, 1813, Mackay's claim of 30 arpents of land, under his concession of 9th Oct. 1799, and survey in 1802, came up for consideration, when he abandons all but 30 arpents; the part abandoned supposed to be within the commons. And *Antoine Soulard* testifies that the tract was granted by Delassus, on the recommendation of Trudeau, who had promised the same: it was surveyed under the

Spanish government, and has ever since been considered as property of claimant. Corn was raised on the premises for claimant during 3 or 4 of the last years. No more abandoned than shall fall within the commons, should they be confirmed.

The report of the recorder of land titles, confirmed by the act of 1816, referring to the claim, concession, and survey recorded in the books of his office, states the quantity claimed by James Mackay to be "30 arpents, surplus abandoned by claimant as falling within the commons of St. Louis;" and under the head opinion of the recorder, is this entry: "Confirmed 30 arps. O. S. Bp, 433, O. Ms. pa. 417, N. Ms. 117. No more abandoned than may fall within the commons should they be confirmed."

In 1816 or 1817, James Mackay enclosed a small piece of ground adjoining the north line of Cerre's grant, and occupied the ground so enclosed by himself and tenant one or two years. Mackay died in the month of March, 1822. William Milburn, who was a clerk in the office of the surveyor general from 1817 until 1839, when he was appointed surveyor general, testified, that there was an official survey of Mackay's grant by Joseph C. Brown; but when that survey was made does not appear, nor is there any record evidence of that survey. He further testified that the first proclamation of the President for the sale of land in the district of St. Louis, which includes the land in question, was made in 1823, at which time fractional section 26, T. 45, N, R. 7 east, was not so surveyed that it could be offered at public sale. In 1822 he, the witness, informed Gen. Rector, then surveyor general, of the unfinished condition of the survey, and also talked with Augustus H. Evans, a clerk in the office, about it. Nothing however appears to have been done at the time on the subject.

At the October term, of the St. Louis circuit court, for the year 1822, Jno. Mullanphy commenced an action of debt against James Mackay's executors, and at the June term, of the same court, 25th June 1823, he recovered judgment for $500 debt, and $232 64 damages, together with costs. An *alias* execution was issued 18th January, 1825, reciting the judgment, and returnable to the first Monday in February, being the first day of the February term, which term was changed to the third Monday of March, by the act of the 3d of February, 1825. On the 21st February, 1825, the sheriff put up advertisements, stating that by virtue of the said execution, he had levied upon, and would sell for cash to the highest bidder, at the court house door in the city of St. Louis, on Thursday, the 31st day of March next, between the hours of 9 and 4, all the right, title, claim, interest, estate and property of James

Mackay in and to a tract of land immediately south of the city of St. Louis, containing 382 arpents, more or less, bounded south by land of A. Soulard; north, by land of A. Chouteau; and west, by vacant land, excepting that part of said tract which had been heretofore sold. A plat of the whole of said land, setting forth the boundaries thereof, and the part sold, can be seen on the day of sale."

The sheriff's deed, (which though objected to was admitted,) bears date 9th April, 1825, and after reciting the execution, proceeds as follows :· "By virtue of which execution, I, the said sheriff, did on the 21st day of February, 1825, levy upon and seize all the right, &c., of him, the said James Mackay, or his estate, or his executors as such in and to a certain tract of land situate, lying and being on the south side of Chouteau's mill creek, containing ten acres and 63 hundreths of an acre, and bounded northward by land of John Mullanphy, and westward by land of Aaron Rutgers, and southwardly by land of the late Antoine Soulard, and designated and known upon the plat, hereunto annexed, as tract number one (No. 1,) and is part and parcel of the tract of 282 arpents, more or less, which is described in the aforesaid advertisement. The courses and distances of the tract of land hereby conveyed will appear from the note on the plat. And the same having been advertised as the law directs, by affixing six advertisements or handbills in the most public places in different parts of my county, at least 20 days before I exposed the same to sale, by virtue of which said execution and advertisement I did, on the 31st day of March, 1825, agreeably to the advertisement thereof, at the courthouse door, during the sitting of the circuit court of St. Louis county, expose to public sale," &c. The deed then states that Henry G. Soulard was the highest and last bidder, and the land is therefore conveyed to him.

Annexed to the deed is a diagram which was furnished by the plaintiff, and was exhibited by the sheriff at the time of sale. This diagram exhibits nine different lots adjoining each other, without any designation of course or distance of any of the lines, nor does it show how the whole is bounded. Beneath the diagram is written "Note. The first tract No. 1, beginning on the west side of the road at a stone in the N. E. corner of Soulard's tract, marked A; thence N. 19 E. 7 20; thence with Mullanphy's line, S. 71, E. 6 85 ; thence N. 62½ E. with Mullanphy's line 6 75; thence with Chouteau's line S. 12, E. 1 75; thence S. 21, W. 11 00, to Soulard's north line ; thence with said line N. 26, W. 1 50 ; thence with said line N. 71, W. 7 00 ; thence with same line N. 54½, W. 2 75 ; thence with Soulard's front line in the road S. 35 1-2, W. 0 75; thence N. 71, W. 1 30, across the road to the begin-

ning at the stone, so as to include 12 49-100 arpents, equal to 10 63-100 acres."

Neither the diagram, nor the note thereto, is signed by any one.

On the 30th April, 1828, a patent was granted to Soulard, under Cerre, for the land originally granted to Cerre. The north boundaries are described as beginning at his N. W. corner, a cedar post, in the southerly boundary of a claim in the name of Mackay, thence S. 71°, E. with Mackay's line, at 3 ch. 82 l.; Mackay's corner in Soulard's garden, 10 ch. 56 l. to a post; thence south 30° east 46 ch. to a post.

On the 20th February, 1833, the new board of commissioners proceeded to act on Mackay's claim, and, after taking testimony, on the 7th Nov. 1833, the board declared the opinion, that the claim ought to be confirmed to James Mackay, or his legal representatives. On the 27th Nov. 1833, the commissioners dated their report to the commissioner of the general land office, in which Mackay's claim is No. 54 of the first class.

On the 5th April, 1834, a survey of fractional section 26, T. 45, N., R. 7, E., made by Sprigg, was recorded in the office of the surveyor general, and a copy transmitted to the register at St. Louis. By that survey, the west boundary is represented as being east of the premises in controversy: commencing at a point in Chouteau's line, near the bridge, and running S. 21, W. 10 ch. 93 l. to a corner formed by the N. and N. E. lines of survey 1333, distant from the N. W. corner of the same survey 10 ch. 56 l. On the plat there is written, on the west side of the west boundary, these words: "Survey No. 2017. James Mackay 288 arpents—245 acres." Which survey, if any such ever was made, is not in evidence.

On the 5th Sept. 1834, Robert Duncan made application to the register and receiver at St. Louis, for a pre-emption on fractional section 26, and on the 20th December, in the same year he and Augustus H. Evans, then a clerk in the surveyor general's office, entered into an agreement in writing, by which Evans was to have one-half of Duncan's pre-emption, he paying the purchase money. Which agreement was recorded 13th May, 1836.

On the 29th June, 1835, Duncan, by deed, conveyed to Elias T. Langham, who was then surveyor general, several lots, and parcels of land, and among others, the land claimed by pre-emption, lying north af Cerre, east of Mackay, and west of the Mississippi, subject to the agreement betwen Langham and Duncan.

In Nov. 1835, Langham, the surveyor general, instructed L. M. Eiler, a deputy, to make a survey of Mackay's claim. The instructions were

in writing, but have been lost or mislaid. Eiler testified, that he was furnished with a number of diagrams, or sketches; he made the survey according to his instruction and the diagrams furnished. A. H. Evans was present at the survey which was made in December and January, 1835-6. The survey was returned to, and approved by the surveyor general, on the 25th January, 1836. The approval was written on the return, and the return, plat and approval recorded in the surveyor general's office on the same day, and is known as the official survey No. 2972, and does not include any part of the premises in dispute. The survey contains, in all, 215 62-100 acres, equal to 253 45-100 arpents; of which 37 40-100 acres, or 43 96-100 arpents lie east, of the east line of the commons. The lines were all run to the established variation of 8 ° 26' east. The return is dated 25th Jan. 1836, signed Laurentius M. Eiler, and the approval of the surveyor general written thereon is as follows: " Surveyor's Office, Saint Louis, 25 Jan. 1836. The foregoing survey No. 2972, is this day approved as being conformable to the Spanish survey of Don Santiago Mackay, according to the plat thereof, stated to contain 288 arpents, and recorded in page 434, book B, in the office of the United States recorder of land titles, at St. Louis, Mo." It appears by the certificate of the recorder of land titles, relative to the confirmation to Mackay, that thirty arpents of this tract were claimed before the commissioners; the surplus abandoned by him, as falling within the commons of St. Louis; also that 30 arpents were confirmed, and no more abandoned, than may fall within the commons should they be confirmed. Signed, E. T. Langham.

It was proved by William Milburn, then a clerk in the office, and afterwards surveyor general, that the certificate of Langham was written on the original return, and signed by said Langham, and the whole was recorded on the same day in the office. It happened that in recording the plat, certificate, and description, there was a space left blank because it was not sufficient to record the next return to be registered. Langham was succeeded in the office by Daniel Dunklin, 1836, and he by Milburn, the witness, who continued in office until 1841, when he was succeeded by Silas Reed. He, Milburn, was a clerk under Langham and Dunklin, during the whole period of their service; and no entry was made on the said blank space, until after 1841, when he witness, went out of office. He, the witness, examined the books recently, and found that since the accession of Silas Reed, an entry had been made by him on said blank, which is the same now copied below the plat and description of survey No. 2972, and the certificate of Langham.

An official survey of fractional section 26, T. 45, N., R. 7, E., was made by L. M. Eiler, deputy surveyor, which was returned and approved by the surveyor general, and recorded in the books of his office in March, 1836. The plat and description were given in evidence by the defendant, and the survey includes the premises in controversy; being bounded west by survey No. 2972, south by survey 1333, N. E. by Chouteau's mill tract, and east by the Mississippi.

On the 25th March, 1836, Langham, the surveyor general, transmitted a duly certified copy of the plat and field notes, of the above survey, to the register at St. Louis, accompanied by a letter of that date, requesting a return of the plat of two fractions of said section 26, previously transmitted to the same office, in 1834, and that the corrected survey, then sent, should be placed on file in lieu thereof; which was done.

On the 20th April, R. Duncan renewed his application for a pre-emption on said fractional section, which was granted on third of May following, and the purchase money paid on the same day.

On the 4th July, 1836, the report of the commissioners, including Mackay's claim, was confirmed with a proviso, that if it should be found that any tract confirmed, *or any part thereof* had been located by any person under any law of the United States, *or* had been surveyed and sold by the United States, the act should confer no title to such lands in opposition to the rights acquired by such location or purchase.

On the 10th Sep. 1836, said fractional section having been previously laid out into lots, and streets, as an addition to St. Louis, Elias T. Langham and wife, by deed of that date conveyed to Christian Ott, the defendant, and Christian Ruff, for valuable consideration, two of said lots, which include the premises sued for. The purchasers immediately took possession of said lots which adjoin each other, and erected thereon two valuable two story stone houses, which they have ever since occupied and possessed.

On the 31st August, 1837, Daniel Dunklin, then surveyor general, appointed Charles DeWard to survey a tract of about two hundred and some arpents of land, confirmed to James Mackay, or his legal representatives, by the act of Congress of the 4th July, 1836. Commissioners' Decision, No. 54. The instructions to DeWard state that "as there is an indefiniteness in the grant both as to quanity, and in the western extension of the survey, also in the locality of the Carondelet road at the time of the grant, we must be governed by the survey executed under Spanish authority, a plat of which, from the recorder's office, forms a part of the accompanying evidence of the confirmation; but as this

plat is defective in not giving the course, and length of the N. E. boundary, you will, as regards this line, conform to the enclosed plat, copied from the Spanish Register in this office."

"The tract was surveyed under the authority of this office in Dec. 1835, and Jan. 1836, (as represented in the accompanying plat C,) as being conformable to the Spanish survey recorded in the recorder's office. This survey is believed to be correct, except as to the position of the eastern and western boundaries thereof, which seem to be erroneous, for the reason that the surveyor assumed, as the S. E. corner of the survey, the N. E. corner of survey No 2016, on the present Carondelet road, instead of going to the old road, as represented in the accompanying plat marked D. By running the south boundary the distance called for on the old plat from the assumed S. E. corner, you will see by the plat marked C, that the course of the west boundary is quite different, after allowing for the variation of the needle, from the course of the Spanish plats marked A and B. And you will also see that by running the S. E. boundary from the said assumed corner, it intersects Chouteau's line at 18-88 chains, instead of 17-19 chains (61 French poles,) as set down in the Spanish plat; and that the N. E. boundary is but 12-99 chains, when the plat marked B, copied from the Spanish Register, shews it to be 56 poles, equal to 16 33 chains." Signed Daniel Dunklin.

A plat and description of a survey said to have been made by De Ward, under the foregoing instructions, was given in evidence by the plaintiff as survey No. 3123. When the return was made, does not appear. It commences by stating that the survey was made in December, 1837, but in the description of the first line, which commences 5-54 ch. east of the west line of the Carondelet road, running on the course of Soulard's north boundary, and along it, two calls are made for monuments erected by the same surveyor in 1838, one for the N. W. corner of Soulard's survey, and N. E. of that of M. N. Lebois, and the other for the N. W. corner of Lebois' survey. It is manifest that the survey was not made until late in 1838, or afterwards. It was not approved while Dunklin or Milburn continued in the office of surveyor general. This survey includes the premises in controversy.

On the 5th March, 1838, the defendant was served with a written notice, signed Henry G. Soulard, informing the defendant that he, defendant, had erected a building, and made other improvements on the land bought by him, Soulard, at sheriff's sale, and commanding the defendant to abandon the same forthwith, and to remove himself and all his moveables therefrom. This was followed by a similar mandate signed

by James G., Henry G., and Benj. A. Soulard, served on the defendant 27th Jan., 1841.

On the 6th August, 1841, Silas Reed, then surveyor general, approved the survey and return made by De Ward. This appears, not by any certificate on the return, but it is so stated by Mr. Reed, in an entry made in June, 1842, touching the survey made by Eiler, hereinafter mentioned.

On the 17th June, 1842, Silas Reed, then surveyor general, made, or caused to be made, an entry in the blank space, which had been left below the record of the plat and description of survey No. 2972, by Eiler, and the certificates thereunder written—which entry is as follows: "Surveyor's office, Saint Louis, 17th June, 1842. The survey of the tract of James Mackay, which is platted, and described on pages 104 and 105 of this book, was executed, it appears, in December, 1835, and January, 1836, under the confirmation of 30 arpents thereof, east of the line of the St. Louis common, by act of Congress of 29th April, 1816, as entered on the report of recorder Bates, of 2d of February, 1816. The said plat and description of the survey of Mackay's tract, are hereby annulled, because it was not executed in conformity with the lines of the Spanish survey of that tract, upon which its confirmation was based, recorded in page 55 of *Registre d' Arpentage*, St. Louis, A, and with the lines of the Spanish survey of the adjoining tract of Auguste Chouteau, on page 19 of *Registre d' Arpentage pour les terres de la dependence de St. Louis*, B, in this office, and which *Registre d' Arpentage*, (books of surveys,) are duly certified by Antoine Soulard, Spanish surveyor general of the province of Upper Louisiana    Nor does it appear that the above signature of E. T. Langham, approving the said survey of Mackay, is the proper hand-writing of E. T. Langham, former surveyor general of the States of Illinois and Missouri. The entire tract of James Mackay was confirmed by the act of Congress of 4th July, 1836, entitled, 'an act,' &c., under decision No. 54 of the late board of commissioners. A survey thereof was made under the late confirmation *in September*, 1837, conformable to the lines of the Spanish surveys above mentioned, *and the same approved* on the 6th of August, 1841, as platted and described on pages 204 to 207 of this book." Signed " Silas Reed, surveyor," &c. This certificate was appended to the copy of the survey No. 2972, given in evidence by the defendant, and the whole certified by Silas Reed to have been correctly copied from pages 104 and 105 of record book C, in his office.

It appears that the plat and description of De Ward's survey, was

recorded on pages 204, 205, 206, and 207 of book C, in the office of the surveyor general—when, does not appear—but on the 28th November, 1843, Silas Reed, then surveyor general, made the following entry on pages 322 and 323 of the same book, to-wit:

"Continued from page 207. Surveyor's office, St. Louis, Nov. 28th, 1843. From the plat and description of survey No. 3123, recorded on pages 204, 205, 206, and 207 of this book, and from the records of this office, it appears that 177 76-100 acres of said survey, are included in the tract designated as 'common of St. Louis,' (survey No. 3110 confirmed to the inhabitants of the town of St. Louis by the act of Congress of 13th June, 1812, entitled 'an act,' &c.) Therefore in conformity with the provisions of the 2d section of the act of Congress of the 4th of July, 1836, entitled, &c., a certficate of the new location No. 30, is this day issued for 177 76-100 acres, the amount of said interference. The remaining part of the survey, situate outside of the St. Louis common, having been previously confirmed by the act of Congress of 29th April, 1816, confirming the claims embraced in the report 2d Feb., 1816, of F. Bates, recorder, &c.—the interference of 27 2-100 acres of Mackay's survey with the survey numbered 368, in the name of A. Chouteau, under Laclede Legiste, confirmed on the 7th June, 1810, by the board of commissioners under the certificate No. 363, is on that account excluded from the certificate of new location."

A certified copy of the plat and description of survey No. 3123, was on the 29th Nov., 1843, issued to F. R. Conway, U. S. recorder of land titles, for his action thereon. This entry was not signed by any one, and does not purport to have been.

In December, 1843, the recorder of land titles issued a patent certificate No. 1174, for that part of survey No. 3123 not embraced within the commons or the survey No. 363, being 44 acres 63-100.

The plaintiff then prayed the following instructions, which were given, and an exception was taken to the giving of them:

1. That the confirmation by the recorder of land titles of a part of the claim of James Mackay, as given in evidence by the plaintiff, embraced all the land east of the line of the commons included in the Spanish survey of Mackay's claim, as the same has been certified from the office of the surveyor general, and given in evidence by the plaintiff.

2. That the jury in ascertaining the boundaries of the part of Mackay's claim, east of the line of the commons, will be governed by the actual survey made by the Spanish surveyor, and if that actually passed east of the road, as left between the grants of Cerre and Sou-

lard, that survey will still fix the rights of those claiming under Mac-kay, as extending east of that road.

3. That the jury will take the survey of Mackay's claim, as made by DeWard, as the authoritative and correct survey, determing the boun-daries of that claim according to the Spanish survey.

The defendant then asked the following instructions :

1. The confimation by the recorder of land titles to James Mackay, given in evidence by the plaintiff, entitled said Mackay to 30 arpents of land east of the east line of the St. Louis commons, with boundaries to be established by a survey to be made under the authority of the United States.

2. If the jury find from the evidence that the survey made by L. M. Eiler, of the grant to Mackay, given in evidence, was approved by the surveyor of public lands of the United States, for the States of Illinois and Missouri, and recorded by said surveyor in his office, as the official survey of said land, including the part confirmed by the recorder of land titles; that said survey contains 30 arpents or more, east of the east line of St. Louis commons, then said survey ought to be regarded as establishing the boundaries of the land confirmed by the recorder.

3. Unless the jury find from the evidence that the lot in dispute, or a part thereof, is within the boundary of the tract of land claimed by James Mackay before the board of commissioners, as designated on the plat, and described in the certificate of survey filed by said James Mac-kay, with his said claim in the office of the recorder of land titles, they ought to find for the defendant.

4. If the jury find from the evidence, that prior to, and on the 4th July, 1836, the lot in question was without the boundaries of the tract confirmed to James Mackay by the recorder, and within fractional sec-tion 26, township 45, north, range 7 east, as surveyed under the author-ity of the United States; that the United States, before that day, grant-ed the right of pre-emption in, and sold to Robert Duncan, the whole of said frational section, then the plaintiffs are not entitled to recover, unless it appears to the satisfaction of the jury, that the said lot in dis-pute, or a part thereof, is within the boundaries of the tract of land granted to James Mackay on the 9th October, 1799, as designated on the plat, and certificate of survey filed by said Mackay with his claim, in the office of the recorder of land titles.

5. The call in the grant to, and survey for James Mackay, under the Spanish government, for the king's highway as the eastern boundary, ought to be understood to mean a road previously established, laid out or recognized by the lieutenant governor, or surveyor general

of Upper Louisiana, as the public road going from St. Louis to Carondelet.

6. If the jury find that previous to the grant and survey for Mackay, a road was laid out, or established by the lieutenant governor, or surveyor general, between the grants to Cerre and Soulard, as a part of the king's highway, or public road leading from St. Louis, to Carondelet, then the southern boundary of the land granted to Mackay, cannot be extended east of said public road so laid out, established or recognized.

7. If the jury find from the evidence that the whole of the lot in dispute is within the fractional section 26, T. 45 N., R. 7 E., and without the tract confirmed to James Mackay, by the recorder of land titles, that the right of pre-emption in the whole of fractional section was granted to Robert Duncan by the United States, and that said Duncan purchased said fractional section from the United States prior to 4th July, 1836, the plaintiff is not entitled to recover unless the lot in dispute, or a part thereof, is within the original grant and survey in favor of James Mackay.

8. If the jury find from the evidence that what is now called Caron delet Avenue, occupies the space of ground designated on the plat of survey of the grants to Gabriel Cerre and Antoine Soulard, as the road leading to Carondelet, then the southern line of the grant to James Mackay does not extend east of that avenue, unless the jury also find that previous to the 9th October, 1799, there was a public road established or recognized by competent authority as such, eastward of the east line of the grant to Gabriel Cerre, going from St. Louis to Carondelet.

9. The fact, if proved, that there was, prior to 9th October, 1799, a traveled way eastward of what is now Carondelet Avenue, and used by persons going from St. Louis to Carondelet, does not authorize the extension of the southern boundary of the grant to Mackay east of said avenue, unless such traveled way was recognized or laid out as a public road by the surveyor general, or lieutenant governor of Upper Louisiana.

10. Unless the jury find from the evidence that the lot in dispute, or a part thereof lies west of the public road leading from St. Louis to Carondelet, as established or recognized by competent authority, (if they find any such road established,) they ought to find for the defendant.

All these instructions were refused by the court, except the third, and an exception taken to the refusal. The court gave the third with the following addition or explanation, viz: "That the copy of the Spanish

survey, as taken from the registry of surveys kept by Antoine Soulard, the Spanish surveyor general, is better evidence of the Spanish survey, than the copy taken from the recorder's office." To the giving which, with this addition, and refusing to give it as asked, an exception was taken.

A new trial was asked for on the usual reasons, that the verdict was against law and evidence, weight of evidence; and because the court admitted improper evidence, and rejected proper evidence, and erred in giving and refusing instructions; which motion was overruled, and an exception was taken to that act of court.

The first question presented for consideration, is whether the confirmation of the recorder was for quantity, or whether it was for all the land included in the claim which lies east of the commons. When Mackay's claim was first presented to the board of commissioners for confirmation, it was rejected on the erroneous supposition that it was antedated. Being afterwards laid before the recorder of land titles for confirmation, an objection was interposed to it for the reason that it interfered with the St. Louis commons. The agent of Mackay, to remove the objection, agreed to abandon all of the claim that lay west of the line of the commons, and supposing the remainder, after such an abandonment, would be 30 arpents, as it was entered with the recorder for about thirty, he has the claim confirmed for so much. But to remove all doubt as to the effect of the abandonment, it is expressly stated in the act of confirmation, that only so much is abandoned as lies west of the line of the commons, thus showing that the abandonment was not intended to affect that portion of the claim which did not interfere with the commons. It was, in fact, renouncing all the land covered by the commons. The conflict of the claim with the commons being the inducement to the abandonment, we cannot extend the effect of the act further than the motives which induced it show that it was intended to be carried. It is a rule in the construction of grants that when the quantity is mentioned in addition to a description of the boundaries, or other certain designation of the land, the whole is considered as mere description. The quantity being the least certain part of the description, must yield to the boundaries, if they do not agree. Effect is to be given to every part of the description, if practicable; but if the thing intended to be granted appears clearly and satisfactorily from any part of the description, and other circumstances are mentioned which are not applicable to that thing, the grant will not be defeated, but those circumstances will not be rejected as false or mistaken. We think it may be inferred from the whole terms of the confirmation, that nothing

was designed to be relinquished but that portion of the claim of Mackay which interfered with the commons.

The next and most important enquiry involved in this controversy, is whether a resort can be had to the survey of Mackay's claim on the books in the surveyor general's office, in order to supply the defects of the plat of the survey filed by him with the board of commissioners. It will be recollected that the plat of the survey laid before the board of commissioners, omitted to show the course and distance of one of the lines and the course of another. These omissions do not exist on the plat of the survey of Mackay's claim recorded in the books of the surveyor general; and the question is whether we can resort to those books in order to show what was included in the survey and plat exhibited to the commissioners appointed for the confirmation of land claims? The 4th section of the act of Congress of March 2nd, 1805, provides that all claimants of lands under the French and Spanish governments shall deliver to the recorder of land titles a notice in writing, stating the nature and extent of his claims, together with a plat of the tract or tracts claimed; and shall deliver to the recorder, for the purpose of being recorded, every grant, order of survey, deed, conveyance, or other written evidence of his claim, and the same shall be recorded by the recorder. Did this provision stand alone, it might countenance the argument, that in order to ascertain the extent and boundaries of a claim, recourse must be had, in preference to other sources, to the information in the recorder's office. The 2nd section of the act of Congress of 28th February, 1806, shows how this plat came to the office of the surveyor general. It provides that all the plats of surveys, and all other papers and documents pertaining, or which did pertain to the office of surveyor general under the Spanish government within the limits of the territory of Louisiana, or to any other office heretofore established or authorized for the purpose of executing or recording surveys of land within the said limits, shall be delivered to the principal deputy surveyor of the said territory, (an officer created by the said act;) and no plat of survey shall be admitted as evidence in any court of justice, unless certified by the principal deputy to be a true copy of the record in his office. The 7th section of the act of Congress of March 3rd, 1807, provides that the tracts of land granted by the commissioners shall be surveyed at the expense of the parties, under the direction of the surveyor general, or officer acting as surveyor general, in all cases, when an authenticated plat of the land, as surveyed under the authority of the officer, acting as surveyor general under the French, Spanish or American governments respectively, during the time either

38

·of the said governments had the actual possession of the territories of Orleans and Louisiana, shall not have been filed with the proper register or recorder, or shall not appear of record on the public records of the said territories of Orleans and Louisiana.

The 6th section of the act of Congress of June 13, 1812, enacts that, in all cases when by reason of the indefinite description of the local situation and boundaries of any tract, the claim to which has been confirmed by the commissioners, the same cannot be ascertained by the principal deputy surveyor, it shall be the duty of the recorder of land titles, on the application of said principal deputy, to furnish such precise description thereof as can be obtained from the records in his office, and the books of the said board of commissioners; and for the purpose of more correctly ascertaining the locality and boundaries of any such tract, the said principal deputy shall have free access, at all reasonable hours, to the books and papers in the recorder's office relating to land claims, and be permitted to take copies or extracts therefrom. The act of February 28, 1806, before recited, having previously transferred the plats of surveys in the surveyor's office under the Spanish government, to the principal deputy surveyor of the U. States, we are not to infer, because he is not directed to examine his own records to ascertain the extent and boundaries of confirmations, that therefore the reference to them, as contemplated by the 7th sec. of the act of 3d March, 1807, was not intended.

Taking the several acts of Congress on this subject together, we are warranted in maintaining that the U. States were anxious to confirm incomplete claims derived from the French and Spanish governments, with the boundaries and extent they had when they first originated; and to effect this end, were willing to resort to all reliable sources of information. The 7th sec. of act of March 3, 1807, before recited, which directs that surveys shall be made at the expense of the parties, when plats shall not have been filed with the recorder, *nor appear of record on the Spanish surveyor's book,* shows that in cases of doubt and uncertainty, reference should be had to the Spanish record of surveys and plats. Under that act if no plat had been filed with the recorder, it is clear that we might have fallen back to the plat in the surveyor general's office. If a resort can be had to the plats of that office when there is no plat with the recorder, on what principle should he be debarred from such a resort when the plat filed with the recorder is defective?

We do not consider that the court was warranted in telling the jury that the plat from the surveyor's office was better evidence than that

Ott vs. Soulard.

filed with the recorder. For if the plat filed with the recorder had been complete, yet variant from that in the office of the surveyor general, the survey under the confirmation, we presume, would have been in conformity to the plat with the recorder, and in reference to which the confirmation was made. The plat from the office of the surveyor general was auxiliary evidence, by no means better than that furnished by the plat filed with the recorder. If there were nothing in the laws of the U. States on this subject, from which we would be justified in referring to the plat in the surveyor general's office, in order to ascertain the boundaries of this survey, yet the plat and survey filed with the recorder, referring to the surveyor's office by book and page, and on the book and page referred to, finding a complete plat of the survey, we can not yield to the force of the objection to its being used as evidence. So distinct a reference to a book in a public office would seem to incorporate the matter referred to in the certificate of survey, and make it, as it were a part of it. It would certainly give all persons notice who might wish to purchase any land adjoining the survey.

The question next arising in this, is as to the authority of the several surveys which have been relied on by the parties respectively. It will not be necessary to examine the surveys separately and declare their effect, but it is deemed sufficient to state the principles which, in our opinion, are applicable to such official acts, and which must determine their validity and effect. When a survey is made by authority of the U. States, and it is a matter of concern between the government and the grantee only, not affecting the rights of others, there is no ground of interference for our courts. If the federal government will send officers here who will grant away lands without authority of law, it is no concern of our tribunals. But when a right or title to land has passed from the government to individuals, the government cannot revoke or destroy that right, nor can it authorize its agents to do so. The circumstances of the present case, showing how surveys are annulled, and resurveys are ordered, and approved when made, should satisfy us how chary any court should be in telling a jury that a survey is authoritative and correct, and how dangerous it would be to entrust to surveyor generals the power of determing the rights of individuals by surveys. When the rights of third persons are concerned, a surveyor cannot affect them by a survey. The object of a survey is to locate lands according to the boundaries and descriptions contained in the grant. When the calls of a survey are all ascertained by the grant, and there is no necessity for reference to external evidence to ascertain or identify them, their construction is a matter of law and belongs exclu-

sively to the courts; but when parol evidence is introduced to ascertain or identify the, calls, then it is a question of law and fact, the jury finding the fact, and the court declaring the law. In the case of Cockrell vs. McGuinn, 4 Mon. Rep. 63, Judge Owsly, in delivering the opinion of the court, says: "In cases of boundary which depend upon the swearing of witnesses, it would, no doubt, be incompetent for the court, by any sort of instruction that might be given, to withdraw from the jury a decision upon the weight of the testimony, and the facts which the testimony conduces to establish. The actual position and identity of the boundary, in such a case, would be exclusively a question of fact for the consideration and determination of a jury and not the court."

If the foregoing principles be applied to the case under consideration, it will be found that the third instruction given at the instance of the plaintiff cannot be sustained. In the petition of Mackay for a concession, which is in the French language, the call is for "*le chemin publique*"—the *public road*. In the certificate of survey accompanying the plat of the land conceded, which is in the Spanish language, the call is for "*el real camino*"—the *royal road*. In locating the survey with this call, a difficulty arises from the fact of there being two roads near each other, and the right of the parties to this suit depends on the determination of the question,—which of these two roads was intended by the terms of the concession? Now as there was parol evidence as to the condition of these two roads, and as the use of them by the public, the question as to which was intended by the terms of the concession, was a mixed one of law and fact, and the jury should have found the facts or been instructed hypothetically; and the law, as to the facts, as they may have been found by the jury, should have been declared to them by the court. So the third instruction precluded any objections which the defendant in his argument or otherwise might have made to the plat found in the surveyor general's office. That instruction depriving the defendant of these advantages, and usurping the province of the jury, cannot, on principle, be sustained.

The sources of information enjoyed by this court in relation to the Spanish law concerning public roads, are so extremely limited that the expression of an opinion on the subject will not be hazarded. Another trial may furnish the information necessary. If there were no written law here concerning this matter, usage and custom made the law, or at least are evidence of what it was. In determining this question, we cannot adopt the principle that in the absence of the knowledge of the foreign law, it will be presumed to be like our own. This court must

take judicial notice of the Spanish laws which formerly prevailed here, and those who have rights depending on those laws, will insist that this should be done. The doctrine that long continued, and uninterrupted use and enjoyment, will confer a right of way, has its foundation in the good sense and reason of the thing, and is familiar to the common law. We cannot think this doctrine, so consonant with the quiet and repose of society, can be long a stranger to the code of any civilized people.

As to the point in relation to the sheriff's deed, it may be remembered that this case does not come within the principle of Evans vs. Ashley, decided by this court. The advertisement describes the whole tract of Mackay, giving the boundaries, and states that a plat of the whole of said land, setting forth the boundaries and the part theretofore sold, which would not be sold, could be seen on the day of sale. It was shown in evidence that this plat was exhibited at the sale, on which the parts to be sold were delineated. The point of the objection in this is not that the property to be sold was sufficiently ascertained and declared. The defect in the sale, if any, is that the plats not having been exhibited until the day of sale, it did not appear until that time, what was to be sold, and therefore the requisite notice was not given.

The principle heretofore maintained by this court, is that no property passes by a sheriff's deed but that which is ascertained and declared at the time of sale. But it is not thence to be inferred that every deviation from the law by a sheriff in conducing a sale will make it void. Sales may be set aside for irregularities committed by the sheriff in conducting them, but there is a broad distinction between setting aside a sale on an application made therefor, and treating it as a nullity. See the case of Rector vs. Hartt, 8 Mo. Rep. where this distinction is illustrated.

The other judges concurring, the judgment will be reversed and the cause remanded.