LOUIS V,ASQUEZ et al., Respondents, v. WILLIAM L. EWING, Appellant.

1. *Act of Congress of 1812 — Commons Title—Recorder Hunt's Certified list— Proof of inhabitation, cultivation, etc., prior to 1803.*— A commons title, under act of Congress of June 13, 1812, with an approved survey, is equivalent to a patent, and must prevail, unless the claimant can prove the facts necessary to show that no title passed; and this may be done by actual proof that claimant had inhabited, cultivated, or possessed a lot, within the meaning of that act, prior to December 20, 1803, situated within the boundaries of the survey of the commons. But documentary evidence, consisting of Recorder Hunt's certified list of lots, confirmed under the acts of June 13, 1812, and May 26, 1824, a U. S. survey and field notes showing the lot sued for, and a certificate of confirmation issued by the United States Recorder of Land Titles, taken alone, are only *prima facie* evidence of title, and not sufficient to surmount the commons title under the act of 1812. (Vasquez v. Ewing, 24 Mo. 31, affirmed.) And it is not enough merely to prove inhabitation, cultivation, or possession, somewhere on the land claimed. There must also be evidence of the location and boundaries of the lot.
2. *Out-lot—Existence of facts necessary to constitute, how determined.*—The existence of facts necessary to constitute an "out-lot" is a question of law for the court.
3. *Out-lot—Location and Boundaries prior to 1803.*—To constitute such a lot, it must be shown to have had an existence as such under the former government, prior to the 20th of December, 1803, with a definite location and boundaries.
4. *Out-lot—Surveyor-General—Power of, to assign location to.*—The Surveyor-General had no authority by law to assign a location to such out-lots, but authority only to survey them by their definite location and boundaries, as they had actually existed prior to 1803, or as the same had been proved before the recorder; nor had his superior officers of the land office any authority by law to create, by instructions, a definite location and boundaries for such lots, where none existed before.

5. *Out-lot — How shown by evidence of facts in pais.*—When an out-lot is to be proved by evidence of facts *in pais*, it must be shown to have existed in the character of an out-lot prior to December 20, 1803, with designated and ascertainable location and boundaries; though actual occupancy or cultivation may not be essential to establish its existence.

6. *Concession under Spanish Government — Abandonment — Re-annexation.*— Where, under the former government, a written concession, by the lieutenant governor, of certain land was given, upon a condition set forth in the concession, and on the margin of the record of the same was a subsequent entry declaring that the lot remained incorporated in the royal domain on account of the owner having abandoned it, such entry must be competent to show that the practice of abandonment and re-annexation prevailed at that time, and, *a fortiori*, it must be competent to show a re-annexation of the very land conceded.

## *Appeal from St. Louis Circuit Court.*

This is an action of ejectment, brought by plaintiffs against defendant in the St. Louis Land Court, in 1857, to recover possession of a certain parcel of land in St. Louis county, fully described in the plaintiffs' petition, containing thirty-two arpents, and designated as U. S. survey 2965. On the trial, plaintiffs offered in evidence: 1. A certified copy of an extract from the list of lots furnished by Recorder Hunt to the office of the Surveyor-General of Illinois and Missouri, as those the titles to which had been proven up before him under the provisions of an act of Congress of May 26, 1824, by which extract it was shown that the land in controversy was certified as confirmed to the legal representatives of Benito Vasquez under acts of Congress of 1812 and 1824. 2. A certified copy of U. S. survey No. 2965, which was a survey for the legal representatives of Benito Vasquez of a tract of land of four by eight arpents, and embraces the land in controversy; and also a certified copy of the field notes accompanying said survey No. 2965. 3. Certificate No. 78, issued by U. S. Recorder of Land Titles for same land. 4. De Ward's map of St. Louis commons, and conflicting private claims therein, and showing the private claim of Vasquez for thirty-two arpents. 5. Testimony showing that some part of the land sued for, near Benito Springs, was cultivated and possessed, both prior and subsequent to December 20, 1803, by Benito Vasquez or his servants; that there was a house on the land, and a fence inclos-

ing a cultivated field thereon, and that there were some fruit-trees on the tract.

Defendant's testimony showed: 1. The claim of the inhabitants of the village of St. Louis to the commons of St. Louis, in 1806, embracing the land in controversy; also, the act of Congress of June 13, 1812, confirming claims to lots, commons, etc. 2. U. S. survey No. 3125 of said commons. 3. The deed of the city of St. Louis to William Carr Lane,* dated May 27, 1836, conveying in fee all the land in controversy in this suit. 4. Deed of Louis Vasquez, in 1825, conveying to Wm. Carr Lane all his interest in the land in controversy. 5. Deed of Jacques Martin and Eulalie Martin (daughter of Benito Vasquez), dated March 13, 1834, conveying to said Lane all their interest in said land. 6. Deed of other heirs of Vasquez, dated September 3, 1847, releasing to Francis A. Quinette their interest in survey 2965. 7. Deed of Francis A. Quinette and wife to Wm. L. Ewing, the defendant, dated January 10, 1850, conveying to him their interest in said land. 8. The will of Julie Papin Vasquez, widow of Benito Vasquez, dated April, 1825, making Eulalie Martin sole heir of all her immovable property. 9. A concession by Gov. Cruzat, dated January 6, 1784, of four by eight arpents, to Benito Vasquez, "at the locality called The Three Springs, on condition to improve the same in one year from the date hereof; and on the contrary, the land to revert to the royal domain; it remaining subject to the public and other charges which His Majesty may be pleased to impose thereon in future." On the margin of the record (in Livre Terrein) of this concession is the following entry: "These four arpents remain incorporated to the royal domain, on account of Benito Vasquez having abandoned them."

The following instruction, referred to in the opinion of the court, was given for plaintiffs:

1. The jury are instructed that if the tract of land of four by eight arpents, in dispute, was a tract or parcel of land which was actually possessed, inhabited, or cultivated by Benito Vasquez

---

* Ewing held Lane's title by virtue of purchase at sheriff's sale.

prior to the 20th December, 1803, as his individual property, and his claim thereto was not abandoned prior to 13th June, 1812, and that said Vasquez was an inhabitant of the town of St. Louis, and said parcel of land was an out-lot in or adjoining the town of St. Louis, then the title thereto was, on the 13th of June, 1812, vested in said Vasquez or his legal representatives by act of Congress of 13th June; and no survey made subsequently thereto by the United States, embracing said lands as a part of the land granted by said act of Congress as commons to the inhabitants of the town of St. Louis, can impair or interfere with the title so granted to Vasquez.

*S. T. Glover*, for appellant.

I. The claim to the commons of St. Louis by the inhabitants thereof goes back to 1764, at least twenty years prior to the conditional concession made by Cruzat to Benito Vasquez. In February, 1806, the metes and bounds of their claim were fixed by a survey duly returned and recorded in the office of the United States Surveyor-General, also in the recorder's office of St. Louis county. In 1784 a conditional grant was made to Vasquez at "Three Springs," without any metes or bounds. It might have been laid down in ten thousand ways and done no violence to the terms of the concession. Such a concession, so long as the whole land round about the "Three Springs" remained vacant, would be binding on the equity of the government, and it would make no difference how the government might locate it on its own domain. But as against the definite survey of the commons in 1806, laying down the lines and fixing the corners of that tract, the concession to Vasquez was void. In the nature of things it could not be otherwise. When the terms of the grant did not define any particular lands, but referred to a general locality only, the Supreme Court of the United States held that no lands were granted. (United States v. Delespine, 15 Peters, 334; United States v. Lawson, 5 How. 289; Buyck v. United States, 15 Peters, 223; Watts v. Lindsay's Heirs, 7 Wheat. 158; Littlepage v. Fowler, 11 Wheat. 215; Menard v. Massey, 8 How. 295.)

The act of June 13, 1812, § 1, 2 U. S. Stat. 748–9, enacted

that " the right, title, and claims to town or village lots, out-lots, common field lots, and commons, in, adjoining, and belonging to the several towns of * * * St. Louis, * * * in territory of Missouri, * * * which lots have been inhabited, cultivated, or possessed prior to 20th December, 1803, shall be and are hereby confirmed to the inhabitants of the respective towns or villages, according to their several right or rights in common thereto." If the claim of Vasquez had no definite bounds, and might, at the date of this act, have been laid off in many ways— if it was too vaguely described to be located by one class of boundaries more than another, it was not confirmed; or, if confirmed, the confirmation was so vague as to be null. Such, we think, was the fact. The grant of 1784 was no more certain as to bounds than the proof of witnesses. But, in 1806, the city got her claim surveyed and filed it with the Board of Commissioners. On this claim the act of June 13, 1812, could act, and by force of the certainty of this claim the act did vest a present title, in 1812, to the specific land in the survey of the commons, in the inhabitants of the village. (Page v. Schiebel, 11 Mo. 167.) The act of 1812 conferred title *proprio vigore* on those who had lots with definite metes and bounds. The claimant must bring himself within the act. (Gurno v. Jones, 6 Mo. 336.) Now, we contend that all the time from 1784 to 1852, when survey 2965 made of the claim of Vasquez was approved, no title to the land in that survey had attached. Where the claim has no certain limits, and the judgment of the confirmation carries with it the condition that it shall be surveyed, the title attaches to no land. (Stanford v. Taylor, 18 How. 412.) Where there are no metes and bounds, and no order to survey, and no proofs of metes and bounds orally under act of 1812, the confirmation cannot attach to the land till surveyed; when it does so attach, the conclusion is inevitable that the title is junior to an older survey, and, if in the meantime the land has been surveyed for another, the latter has the best title.

It is said Vasquez's survey is *prima facie* evidence of the correctness of his location. But the survey of the commons is also *prima facie* evidence that the village title covers the land.

And the survey of the commons is prior in time, and therefore superior; and the defendant's title, resting on a *prima facie* location as good at least as that of Vasquez, was superior—*potior conditio defendentis*. This is supposing that the claim of Vasquez to this land was confirmed in 1812. But unless the metes and bounds existed then, it was not confirmed to any particular land. (Magill v. Somers, 15 Mo. 87; Aubuchon v. Ames, 27 Mo. 94.) It is conceded that the title of Vasquez, once made certain by being fixed on some specific land, would, as between the United States and Vasquez, relate back to 1812, but not to overreach the city title which had taken effect prior to the approval of Vasquez's survey. (Alexander *et al.* v. Merry, 9 Mo. 529.)

II. In the first instruction given for the plaintiff, the court misconceived the statute of June 13, 1812, in what was said to the jury about the operation of said act in respect to an out-lot. The court predicated the confirmation on possession, inhabitation, or cultivation of said parcel of land, if the same was "an out-lot in or adjoining the town of St. Louis." With such an instruction, any lot of ground whatever, inside the town or adjoining it, might be confirmed by the act of 1812. But the words of the act are these, "in, adjoining, and belonging to, the several towns or villages." (2 U. S. Stat. 749.) The lot may be in or adjoining the village, but unless it belongs to the village it is not confirmed. (Page v. Schiebel, 11 Mo.. 182; Harrison v. Page, 16 Mo. 205; City v. Toney, 21 Mo. 251.) Up to this last case, whether a parcel of ground was an out-lot, in the meaning of the act of 1812, was deemed a question of law. The case was modified in the case of The City v. Toney, and the court said that, subject to the control of granting a new trial, it was mainly a question for the jury—*mainly*, not entirely. But the court referred the question wholly to the jury, in this case, and took away from it the duty of finding that the lot belonged to the village. We understood the word "belonging," in the act of 1812, to mean subject to the civil regulations of the village in respect to cultivation, fencing, taxing, etc., in the same manner as in common field lots. There was no proof of any such connection with the town.

Vasquez et al. v. Ewing.

*S. S. Simmons*, and *F. A. Dick*, for respondent.

I. The title shown by the plaintiffs on the trial was a confirmation under the act of Congress of the 13th of June, 1812, founded upon inhabitation and cultivation of the lot in question, as an out-lot, prior to the 20th of December, 1803, by their ancestor, Benito Vasquez, upon which, as a matter of law, they were entitled to recover. (City of St. Louis v. Toney, 21 Mo. 251; Vasquez y. Ewing, 24 Mo. 31; Gamache *et al.* v. Pequignot *et al.*, 17 Mo. 322; Gamache *et al.* v. Pequignot *et al.*, 16 How. 451; McGill v. Somers, 15 Mo. 87; Beihler v. Coonce, 9 Mo. 351; Maclot v. Dubrueil, 9 Mo. 489; Montgomery v. Sandusky, 9 Mo. 717; Joyal v. Rippey, 19 Mo. 665; Janis v. Gurno, 4 Mo. 459; Lawless v. Newman, 5 Mo. 240; Corre v. Hook, 6 Mo. 474; Gurno v. Janis, 6 Mo. 330; Carondelet v. Dent, 18 Mo. 296–7; Clark v. Hammerle, 36 Mo. 637; Soulard v. Allen, 18 Mo. 595; Fine *et al.* v. Schools, 39 Mo. 59.)

II. The evidence relied upon by the defendant, of title to the possession of the land sued for in the inhabitants of the town of St. Louis, as a part of the commons, did not, as a matter of law, show a title equal to and countervailing plaintiffs' title: 1, because the act of 1812 furnishes no evidence whatever to designate the extent, boundaries, or location of the St. Louis commons; 2, because the survey of such commons, No. 3125, furnishes no evidence that the lot in dispute was not cultivated and possessed by Benito Vasquez prior to the 20th of December, 1803. This survey, *prima facie*, gives to the city all lands within its boundaries not used by private individuals; and a proof of actual inhabitation, possession, or cultivation, prior to December 20, 1803, of a particular lot, though within the out-boundary of the commons survey, by an individual, excludes such land from the effect of the U. S. survey of the commons. (Mackay v. Dillon, 4 How. 421; LeBois v. Brammel, 4 How. 457–64; City of St. Louis v. Toney, 21 Mo. 251; Vasquez v. Ewing, 24 Mo. 31; and other cases cited above.)

III. The evidence relied on by defendant—to-wit: the act of June, 13, 1812, and U. S. survey 3125—makes only a *prima*

17—VOL. LII.

*facie* case of title to all the land within said out-boundary of said commons survey; but the evidence relied on by plaintiffs — to-wit: the same act of 1812, and the supplemental act of 1824, and Recorder Hunt's certified list and the certificate of confirmation, and U. S. survey 2965, covering the four by eight arpents sued for — makes also a *prima facie* title to the said land in the legal representatives of Benito Vasquez; so that this much of the record only presents two *prima facie* cases of equal dignity — a *prima facie* title for the defendant, and a *prima facie* title for the plaintiff, to the same land. But plaintiffs rely on the further evidence of actual proof of possession, inhabitation, and cultivation, prior to December 20, 1803, by living witnesses; and this last named evidence, as a matter of law, shows a title in plaintiffs superior to and countervailing defendant's *prima facie* title. (Carondelet v. Dent, 18 Mo. 296-7; Vasquez v. Ewing, 24 Mo. 31; City of St. Louis v. Toney, 21 Mo. 251; Beihler v. Coonce, 9 Mo. 351; Hunt's Tabular Statement; Somers v. McGill, 15 Mo. 87; Gamache v. Pequignot, 17 Mo. 323-4; Gamache v. Pequignot, 16 How. 46; Mackay v. Dillon, 4 How. 442.)

IV. The lot sued for is an out-lot within the meaning of the act of June 13, 1812. (Toney v. City of St. Louis, 21 Mo. 251; Eberle v. Schools, 11 Mo. 265.)

V. The jury found, on the evidence relied on by the plaintiffs, that Benito Vasquez, the ancestor of plaintiffs, did inhabit, cultivate, or possess, prior to the 20th of December, 1803, the land sued for, which was an out-lot within the meaning of the act of June 13, 1812; and, so finding that the said land was inhabited, cultivated, or possessed, the jury necessarily found that it could not be commons, although within the out-boundary survey of the St. Louis commons.

VI. The existence of commons in any particular direction does not negative the idea of private claims in the midst of them. Private claims did exist in the Carondelet commons and also in the St. Louis commons, and the titles to some of them this court has declared to be superior to that of the commons title. (Toney v. City of St. Louis, 21 Mo. 251; Carondelet v. Dent, 18 Mo. 296-7; De Ward's map of St. Louis commons.)

VII. There was no abandonment of his claim to the lot sued for by Benito Vasquez or by his legal representatives. Any abandonment to affect this lot must have taken place before 1803. The question of abandonment is peculiarly a question of fact for the jury, and this question was fairly and fully presented to the jury by the instructions, in every conceivable shape, upon the evidence, and the jury found that there was no abandonment; and therefore their verdict should not be disturbed. (Clark v. Hammerle, 36 Mo. 637, and cases therein cited; Fine v. Public Schools, 39 Mo. 59.)

VIII. The instructions given for the plaintiffs, and those given for the defendant, presented the case fully and fairly on the question of title, of identity, and of abandonment. (Clark v. Hammerle, 36 Mo. 637; Fine v. Public Schools, 39 Mo. 59; City of St. Louis v. Toney, 21 Mo. 251.)

HOLMES, Judge, delivered the opinion of the court.

In the case of Vasquez v. Ewing, 24 Mo. 31, in which the plaintiff stood upon the same list and survey which are again presented in this record, it was decided that the commons title, under the act of June 13, 1812, with an approved survey, was equivalent to a patent, and must prevail, unless the plaintiff could prove the facts necessary to show that no title passed; and it was conceded that this might be done by actual proof that the claimant had inhabited, cultivated, or possessed a lot, within the meaning of that act, prior to the 20th day of December, 1803, situated within the boundaries of the survey of the commons; for that if the land were an out-lot it could not have been commons.

In this case, besides the documents mentioned, the plaintiffs introduced the recorder's certificate No. 78, dated February 17, 1852, accompanied by the plat and description of the survey No. 2965, and certifying that, under the acts of Congress of 1812 and 1824, "the legal representatives of Benito Vasquez have been confirmed in their claim to an 'out-lot' south of and near to the town of St. Louis, containing four arpents front by eight in depth, so as to include the spring usually called Benito's

Spring," and that the said out-lot had been regularly surveyed, as appeared from the accompanying plat and description.

The testimony of witnesses was also offered to prove the existence of the facts prior to 1803, which were necessary to be proved in order to bring the land in controversy within the operation of the act of Congress of the 13th of June, 1812, as a grant of title to this land as an out-lot of the town of St. Louis, within the meaning of the act.

It is obvious that if this land had been such an out-lot it could not have been commons. The plaintiff undertook to establish the fact that it had been and was an out-lot, within the direct operation of that act.

It has been settled that the existence of the facts necessary to constitute such a lot is a matter of fact for the jury to determine, but that what facts will constitute an out-lot is a question of law for the court. (Page v. Scheibel, 11 Mo. 182; City v. Toney, 21 Mo. 256.) To constitute such a lot it must be shown to have had an existence, as such, under the former government, prior to the 20th day of December, 1803, with a definite location and boundaries. Such is the theory upon which the uniform course of decision, in cases arising under these acts, has proceeded. Town lots, out-lots, common field lots, and commons, were known and recognized parts of the Spanish town or commune (*del commune*) of St. Louis. They existed by public authority, whether by concession, custom, or permission. It has been held not necessary to prove any concession or permission of the authorities. The legal history of the country would doubtless show that they never existed without permission; but whenever the fact of claim, inhabitation, cultivation, or possession of such a lot, adjoining and belonging to the town, with ascertained or ascertainable location and boundaries, prior to 1803, can be proved, the permission of the authorities may be implied, and is to be presumed. (Harrison v. Page, 16 Mo. 205; Guitard v. Stoddard, 16 How. 494; Fine v. Schools, 30 Mo. 176.) It is not enough merely to prove inhabitation, cultivation, or possession, somewhere on the land claimed. (City v. Toney, 21 Mo. 255.) It would be evidence to go to the jury to prove that particular fact. There must also be

evidence of the location and boundaries of the lot claimed. The act of 1812 was not a grant of lands to be located by survey. It was not a floating grant.

The documentary evidence might be disposed of upon the authority of Vasquez v. Ewing, 24 Mo. 31, without more. It was held that *prima facie* evidence only was not enough to surmount the commons title, and it was deemed that "Congress may pass a title, and then, by a subsequent act, require less evidence to defeat that title than was required when it was first conveyed." In truth, these documents, when admitted, furnished no evidence of the existence of any definite location and boundaries of this supposed out-lot. They did not prove all the necessary facts. Whatever *prima facie* effect they might have in any case, that effect in this case was rebutted and disproved as against the defendant, who stood in a position to call their validity in question. The extract from Hunt's list describes the lot as "four arpents in front, eight deep, bounded in front by the commons or vacant land; then running back eight arpents, so as to include the spring usually called Benito's Spring." It does not appear that any other location, boundaries, or description, was proven before the recorder. Here we have a parallelogram of four by eight arpents, lying in an eastwardly and westwardly direction, so as to include the spring. There was a given outline, but no fixed, no ascertainable location. It is a floating claim merely, which could be located only by the political government acting through the Surveyor-General. This officer had no authority by law to assign a location to such a claim. He had authority only to survey such lots by their definite location and boundaries, as they had actually existed prior to 1803, or as the same had been proved before the recorder. It does not appear that he had any other basis for his action than this extract from the list which had been transmitted to him by that officer. He could derive none from instructions. Of fixed or ascertainable landmarks or boundaries that had existed before the change of government, there were none. The survey does not purport to have found any such landmarks or calls, nor to have ascertained them by any evidence, on the ground. The springs and the remains of the cabin furnished no evidence of

boundaries. The field notes show that the surveyor adjusted the variation of his compass by the lines of a former survey in the neighborhood, and began this survey at a point forty-five links south of the south boundary of that survey, where he established a corner and ran off a parallelogram so as to include the spring and the cabin site. This parallelogram was made to lay more southeastwardly than eastwardly. No reason appears for his starting at that point rather than any other that would make the survey include the spring. It is evident that his proceeding was wholly arbitrary. Nor had his superior officers of the land office any authority by law to create by instructions a definite location and boundaries for such a lot, where none existed before. The certificate, independently of the survey annexed, was no more definite than the list. We think it is apparent that these documents, even if admissible as *prima facie* evidence of what they could show, furnished no proof of any definite location for this lot. At most, they show only an inhabitation, cultivation, and prossession, prior to 1803, and a claim made of a tract of four by eight arpents of land, lying somewhere around the Benito Spring. This was no tract of land, and no out-lot. (Menard v. Massey, 8 How. 309; Stanford v. Taylor, 18 How. 412; United States v. Lawton, 5 How. 28.) If this had been a grant of land to be located by official survey, there is no doubt such a survey as this would have been binding on the government and the parties occupying it. In this class of cases, however, the political power to locate the claim was not retained by the government; the question of location and boundaries was left to the courts. The location that was made can be regarded only as the arbitrary and unauthorized determination of the surveyor. (Ott v. Soulard, 9 Mo. 595.) It is the right and claim that is confirmed by the act, and not merely the possession or cultivation; but there can be no right and claim to an out-lot without boundaries and location.

The act of May 26, 1824, directed the individual owners or claimants to designate their said lots by proving "the fact of such inhabitation, cultivation, or possession, and the boundaries and extent of each claim, so as to enable the Surveyor-General to

distinguish the private from the vacant lots ; " and the recorder was directed to furnish the Surveyor-General with a list of the lots so proved, " to serve as his guide in distinguishing them from the vacant lots" to be set apart for schools.   (4 U. S. Stat. 65, §§ 1, 3.)   These provisions presuppose that such lots already had an existence, with a location, extent, and boundaries, capable of being ascertained and distinguished by the Surveyor-General. It is not doubted that authority was conferred upon him to survey these lots for the purposes of the act ; but there is still no ground for the inference that he was empowered to create a lot by assigning a location or boundaries where none existed before, or where none had been proven before the recorder.   The owners or claimants were to prove the extent and boundaries of their lots, and the recorder was to furnish a list of the lots so proved.   It is manifest that if the proof made failed to show any ascertainable boundaries, the list furnished could not enable the surveyor to perform the duty required of him.   It would be all the same thing as if no proof had been made and no list furnished.   Such being the case here, the survey that was made can have no validity against the defendant.

It is believed that in all the cases in which the certificate of confirmation has been held to be *prima facie* evidence of the facts required to be proved, the record of the proof made, or the registry or list of claims proved, or the certificate itself, when issued by the recorder before a survey, contained calls and description of location, extent, and boundaries, that were capable of being ascertained and identified on the ground by survey, or by the calls and landmarks, or description, without a survey.   In some of the cases the calls and description were somewhat indefinite, but it was still practicable to ascertain the location and fix the boundaries indicated by evidence of identification by the calls, description, and character of the lot.   (City v. Toney, 21 Mo. 243 ; Harrison v. Page, 16 Mo. 182 ; Page v. Scheibel, 11 Mo. 187.) In these cases, the sufficiency of the calls and description contained in the certificate or the tabular list, to admit of identification, was not questioned.

In the case of Gamache v. Pequignot, 17 Mo. 310, the supple-

mentary list and certificate, being acts of Hunt's successor in office, based upon the minutes, were held void, as done without authority of law, for the reason that the recorder had omitted to enter the claim on his registry or list as a claim proved, and the Land Department had refused to record the survey; but we are not aware that it has ever been maintained that the mere fact that a claim was placed in that list was to be taken as evidence that the lot had been proved, as required, as to extent and boundaries, whether such extent and boundaries were shown by it or not, or where none were shown. The list has been held admissible to prove the same facts as the certificate. Aside from the survey, this certificate proves no more than the list. The minutes and the list were the only evidence that remained in the office of the recorder by which it could be made to appear to a successor in the office that such proof had been made before the recorder within the eighteen months, or at any time. The list is the only evidence produced here to show that such proof had been made. It appears to have been the sole basis of the action of the Surveyor-General, and of the recorder, who issued the certificate upon the return of the survey to his office, in 1852. The list did not show any ascertainable location, nor any boundaries that were capable of being identified on the ground. There was, then, no foundation or warrant for this action of the surveyor or recorder. Whatever *prima facie* effect might be due to the certificate in the first instance, when offered in evidence, was effectually rebutted and disproved, as to location and boundaries, by the list and survey that were produced with it. The list was the only legal warrant for the surveyor. He might resort to other evidence to enable him to execute what he was authorized to do; but he was not authorized to locate a floating claim. It does not appear by the survey, nor by the field notes, that he had any other record evidence before him but this list, nor that he ascertained any calls whatever for location of boundaries, otherwise than by a purely arbitrary proceeding of his own. The recorder could act only upon the records remaining in his office. It was not denied, in Gamache v. Pequignot, that the recorder might act upon claims proved before his predecessor in office, but it was held that when

the first incumbent of the office had acted, and furnished a list to the surveyor, the law would draw the conclusion that claims not within the list were claims not proved to his satisfaction. The claim which the plaintiff presents here, so far as the location and boundaries are in question, was not embraced in the list. The conclusion to be drawn from this evidence must be that no location and boundaries were proved before the recorder. It must follow that the claim of the plaintiff to this land as an out-lot was never proved before that officer, and that the documents furnished no sufficient evidence to entitle the plaintiff to recover, as against this defendant, standing on the commons title. Nor could this survey be properly regarded as evidence of boundaries, in connection with the actual proof of inhabitation, cultivation, or possession of a part by one claiming the whole.

We have next to consider how the case stands upon the parol evidence of facts *in pais*. It may be conceded that if this land were an out-lot at all, the proof would sufficiently show that it was situated "in, adjoining, and belonging to, the town." It must have been a part of the commons or civil dependency of the Spanish town. (Eberle v. Schools, 11 Mo. 265; City v. Toney, 21 Mo. 243; 3 Codigos Espagnoles, 336, lines 9–10, tit. 28, *partidas* 3.)

The authorities recognize the theory that when a lot of this kind is to be proved by evidence of facts *in pais*, it must be shown to have existed, in the character of an out-lot, prior to 1803, with designated and ascertainable location and boundaries, though actual occupancy or cultivation may not be essential to establish the existence of such lot. (Trotter v. Schools, 9 Mo. 86.) The act of 1812 operated to confirm "an existing and recognized claim or title, with ascertained boundaries, or boundaries which could be ascertained." (Guitard v. Stoddard, 16 How. 512.) Where such boundaries can be proved, a survey is not necessary to the perfection of the title. In cases of lots assigned to the schools, it has been held that where a vacant piece of land, marked out only by surrounding surveys or by other lots, has been designated and set apart to the schools as a vacant lot, the survey and assignment will prove that the land was a lot, until some third

party can show a better title. (Kissell v Schools, 18 How. 25; 16 Mo. 553.) This principle can have no application to a case like this. There was no such designation of boundaries for this lot. The plaintiff must establish by proof that the land claimed had the character of an out-lot, with definite location and boundaries, and was claimed, inhabited, cultivated, or possessed, as such out-lot, prior to the 20th day of December, 1803. Actual proof is made of inhabitation, cultivation, and possession, on ground within this claim; but there is no actual proof of the location and boundaries of the whole lot claimed, nor that any such out-lot ever existed prior to that date, with the location and boundaries that are now claimed.

It may be said, in general terms, that this testimony was no more effective or complete than the documentary evidence. It afforded no additional proof as to the definite location and boundaries. The witnesses speak of the springs, an old cabin on rising ground, and a fence inclosing the cabin and three or four arpents of land north of the spring. The proof of inhabitation, cultivation, or possession, is confined to these facts. There is not the least indication of any boundaries or any definite location of a lot of four by eight arpents. The situation of the fence mentioned is not ascertained with any certainty as to its locality. There is nothing in the whole testimony by which the outline of the given parallelogram would be anywhere definitely fixed on the earth's surface. It ascertains no metes and bounds. It designates no calls or description of boundary. No facts are proved by which the location and boundaries could possibly be made certain.

The proof wholly failed in this essential element: in the character and description of an out-lot, within the meaning of the act of Congress. This was a question of law. It was not a matter of fact to be determined by the jury, when there was no evidence of the fact before them.

The concession offered in evidence by the defendant has no material effect upon the case. It gave no definite location and boundaries, though boundaries might have been established under it by actual possession and fixed landmarks. But it was re-annexed to the royal domain. The marginal entry of the Lieutenant-

Governor was a part of the official document. Such entries in relation to other lots than the one in litigation have been held to be admissible evidence to show that the practice of abandonment and re-annexation prevailed under the former government, and, *a fortiori*, it must be competent to show an actual re-annexation of the very land conceded. This land may have been conceded again, or a claim and possession might have been subsequently established. There can be no question of an abandonment until a claim to the land, as an out-lot, has been established by proof.

There was some evidence, on the part of the defendant, that Vasquez had been required by the public authorities to remove his cabin and fence from this ground, and that they were removed to his farm on the river, beyond the area of the claim for commons. It is a part of the legal history of the town that other persons were compelled, in like manner, to give-up their possessions on land lying within the limits of the commons, as unlawfully interfering with the public right of commons. This course was sanctioned by the Spanish laws, usages, and customs. Trespassers were driven off and were liable to punishment. Allowing to the proof made all the force it must reasonably be entitled to, it would show scarcely more than that Vasquez or his negroes had been suffered for a time to continue a cultivation and possession, and an actual occupancy, on an indefinite spot of ground near the spring, within the area of the public commons, which was treated by the authorities of the former government, and ought to be considered here, as an unwarrantable interference with the commons right of claim.

But we do not rest our decision upon this part of the case. However this fact may have been, we are satisfied, upon a careful examination of the whole evidence, that it was not sufficient in law to warrant a jury in finding a verdict for the plaintiff, and the jury might properly have been so instructed.

An instruction was refused for the defendant, which read as follows:

"The act of Congress of the 13th June, 1812, by its own force, confirmed to individuals only their rights, titles, and claims to town or village lots, out-lots, and common field lots, in adjoin-

ing, or belonging to the town; and there is no evidence here to prove that the tract of land here sued for is either a town lot, an out-lot, or a common field lot."

According to the view we have taken of the case, this instruction should have been given.

The defendant, standing upon a title from the United States, which must be deemed equivalent to a patent, of the date of the 13th of June, 1812, was in a position to call in question the validity and effect of the documentary evidence issued from the office of the Surveyor - General and Register of Land Titles. (McGill v. Somers, 15 Mo. 80; Robbins v. Eckler, 36 Mo. 506; Ott v. Soulard, 9 Mo. 595.)

The first instruction given for the plaintiffs was erroneous in assuming that there was evidence before the jury from which they might infer the existence of the land in dispute as an out - lot, with definite location and boundaries, prior to 1803.

It is not deemed necessary to notice the other instructions in detail.

The judgment will be reversed and the cause remanded. The other judges concur.